## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL MILLIGAN**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **MICHAEL POMPEO, Secretary of State,** *et al.*, <br><br> **Defendants.** | **Civil Action No. 20-2631 (JEB)** |

## <u>MEMORANDUM OPINION</u>

This case features "pair[s] of star-crossed lovers" on whose lives, like Romeo and Juliet's, a plague has wreaked havoc.  In that tragedy, news of Juliet's ruse never reaches Romeo because an "infectious pestilence" forces a quarantine that blocks the message's delivery.  Here, similarly, COVID-19 has kept apart our Plaintiffs — 153 U.S. citizens and their foreign-born fiancé(e)s.  Each of these cross-border couples wishes to reunite and marry in the United States, but, given the pandemic, none has been able to obtain the visa necessary for the foreigner to travel to America.  Some fiancé(e)s have been barred because the State Department has interpreted Presidential Proclamations to prohibit certain visa adjudications for people who reside in particular countries.  Others, unaffected by the Proclamations, face the State Department's protracted delays in processing their visas.

Believing State's actions to be unlawful, Plaintiffs have brought this suit against the Secretary of State, Attorney General, and Acting Secretary for the Department of Homeland Security, as well as the Departments of State and Homeland Security.  They now move for a preliminary injunction, asking this Court to both enjoin the State Department's visa-processing

1

suspension and to compel the Government to adjudicate their visas more expeditiously.  They

succeed in part.  The Court agrees with Plaintiffs that State has acted unlawfully in suspending

visa issuances based on the Presidential Proclamations, but it finds that Defendants have the

better argument on the delay claim.  The Court will thus grant in part and deny in part Plaintiffs'

Motion.

## I.     Background

The Court will kick off with an overview of the process to obtain a fiancé(e) visa and

provide information on the Presidential Proclamations.  It will then turn to the background of

Plaintiffs' claims and the procedural history of the case.

### A.   Fiancé(e) Visas

The fiancé(e) visa, which is formally known as a K-1 visa, is a nonimmigrant visa that

allows a foreign citizen to travel to America to marry his or her U.S.-citizen fiancé(e) and then

apply for lawful-permanent-resident status.  See U.S. Dep't of Homeland Sec., Visas for

Fiancé(e)s of U.S. Citizens (March 23, 2018), https://bit.ly/35j9Jup (USCIS Fiancé(e) Visa

Information).  It is a subset of K visas, others of which are available to foreign-born spouses and

to children of fiancé(e)s and spouses.

To obtain a K-1 visa, the U.S. citizen fiancé(e) must file a Form I-129F, commonly

known as a Petition for Alien Fiancé(e), with a domestic office of the United States Citizenship

and Immigration Services.  Id.; see also Dep't of Homeland Sec., Petition for Alien Fiancé(e)

(July 23, 2020), https://bit.ly/3eJ57k5 (Form I-129F); U.S. Dep't of State — Bureau of Consular

Affairs, Nonimmigrant Visa for a Fiancé(e) (K-1) (last visited Nov. 10, 2020),

https://bit.ly/3n6Qmug (State Dep't Fiancé(e) Visa Information).  USCIS then reviews the form

for completeness and requests additional documentation as needed.  See USCIS Fiancé(e) Visa

Information.  Once USCIS determines that the U.S. citizen has established the foreign-born

fiancé(e)'s eligibility for the visa, it sends the application to the State Department's National

Visa Center for further processing.  Id.

After NVC receives an approved application from USCIS, it creates a case in the State

Department's electronic application system.  See U.S. Dep't of State, Step 2: Begin National

Visa Center (NVC) Processing (last visited Nov. 9, 2020), https://bit.ly/2JKANtW.  It then

forwards the case to the U.S. Embassy or Consulate where the foreign-born fiancé(e) will apply

and interview for a K-1 visa (generally, where the foreign-born fiancé(e) resides).  Id.; see also

State Dep't Fiancé(e) Visa Information.

The U.S. Embassy or Consulate, once in receipt of the case, schedules an interview with

the foreign-born fiancé(e).  See USCIS Fiancé(e) Visa Information.  A State Department

consular officer conducts that interview, reviews forms and documentation that the couple has

provided, and determines whether the fiancé(e) qualifies for the K-1 visa.  Id.  If the consular

officer grants the visa, it is valid for up to six months, but it "does not guarantee admission to the

United States."  Id.  Rather, "[a] CBP officer at the port of entry . . . make[s] the ultimate

decision about whether to admit [the] fiancé(e)."  Id.  Following admission to the United States,

the couple has 90 days to get married, and the newlywed, foreign-born spouse can then apply for

a Permanent Resident Card (otherwise known as a Green Card).  Id.

In this case, USCIS has approved the Forms I-129F for all 153 couples, see ECF No. 8

(Am. Compl.), ¶ 2, and their applications are at various stages in the State Department's visa

processing.  More specifically, as of October 9, 2020, many Plaintiffs have cases pending at the

NVC and await transfer of their applications to an Embassy or Consulate, id., ¶¶ 160–246; others

have cases pending at an Embassy or Consulate and await the scheduling of an initial consular

interview, id., ¶¶ 96–159; some await rescheduling of a canceled interview, id., ¶¶ 52–95; a few have upcoming interviews scheduled, id., ¶¶ 41–50; a few have completed the interview and await the visa's issuance, id., ¶¶ 34–40, and a few await revalidation of a previously expired visa. Id. ¶¶ 21–33.

     B.  Presidential Proclamations

In addition to the barriers imposed by the above-described application process, some Plaintiffs must navigate independent prohibitions on entering the country. As the COVID-19 pandemic swept the globe, President Donald J. Trump issued a series of Presidential Proclamations that have suspended the entry of certain immigrants and nonimmigrants from 31 countries. See Proclamation No. 9984, 85 Fed. Reg. 6,709 (Jan. 31, 2020) (Republic of China); Proclamation No. 9992, 85 Fed. Reg. 12,855 (Feb. 29, 2020) (Iran); Proclamation No. 9993, 85 Fed. Reg. 15,045 (Mar. 11, 2020) (Schengen Area — i.e., 26 European countries, including Austria, France, Norway, Poland, and Spain, that generally allow people to travel freely across their borders); Proclamation No. 9996, 85 Fed. Reg. 15,341 (Mar. 18, 2020) (United Kingdom and Ireland); Proclamation No. 10041, 85 Fed. Reg. 31,933 (May 24, 2020) (Brazil). To support the Proclamations, the President invoked provisions of the Immigration and Nationality Act, including 8 U.S.C. § 1182(f), which vests him with authority to "suspend the entry of all aliens" "into the United States." Id.

Relying on section 1182(f) in each Proclamation, the President suspended the "entry . . . of all aliens who were physically present within [any of the 31 countries] . . . during the 14-day period preceding their entry or attempted entry into the United States." E.g., Proclamation No. 9984, 85 Fed. Reg. at 6,710 (Section 1). Each Proclamation excepts from its prohibition, inter alia, lawful permanent residents of the United States; aliens who are spouses, parents, or children

4

of U.S. citizens; and aliens whose entry is determined to be "in the national interest." Id. at 6,710–11 (Section 2). The President did not, however, exempt foreign-born fiancé(e)s, like Plaintiffs, from the entry suspension. Id. Under the Proclamations, which remain in effect, the Secretary of State is charged with implementing each "as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish." Id. at 6,710 (Section 3).

The State Department has interpreted the Proclamations to suspend its processing of many visas, including fiancé(e) visas, in the Proclamation countries. See ECF No. 5–1 (PI Mot.) at 3; ECF No. 10 (Opp.) at 16. For the Plaintiff couples with a foreign-born fiancé(e) who resides in any of the Proclamation countries — referred to as "Proclamation Plaintiffs" — their progress is thus stalled. The Proclamations do not, however, affect the visa applications of the couples with a foreign-born fiancé(e) who resides outside those 31 countries — i.e., the "non-Proclamation Plaintiffs." This distinction between the two groups of Plaintiffs will be significant as this Opinion unfolds.

## C. State Department and COVID-19

The State Department's management of U.S. Embassies and Consulates during the pandemic is also relevant to Plaintiffs' claims. On March 20, 2020, it "suspended all routine visa services worldwide." ECF No. 10-1 (Declaration of Brianne Marwaha), ¶ 2. In the early stages of the pandemic, U.S. Embassies and Consulates nonetheless "continued to provide mission critical or emergency services to the extent they were able to do so." Id. Those services included "diplomatic and official visas, [agricultural visas] associated with food supply, [and visas for] certain medical professionals." Id. Diplomatic outposts also prioritized visas for

spouses and unmarried children of U.S. citizens, children at risk of aging out of visa eligibility, and adoptees.  Id.

With the pandemic wearing on and the backlog of visa applications piling up, the State Department announced in July 2020 that U.S. Embassies and Consulates would continue to provide emergency and mission-critical services, as possible, and would also "begin providing additional services, culminating eventually in a complete resumption of routine visa services." Id., ¶ 3 (quoting U.S. Dep't of State — Bureau of Consular Affairs, Phased Resumption of Routine Visa Services (last updated Nov. 12, 2020), https://bit.ly/36x4Qgq).  While State adjudicated few K-1 visas during the initial months of the pandemic, see ECF No. 10-2 (Declaration of Brenda L. Grewe) at 2 (stating that State Department adjudicated 120 K-1 visas in April 2020, 113 in May 2020, 270 in June 2020, and 452 in July 2020), by August 2020, it turned greater attention to their processing.  It authorized its posts to "give K visa cases high priority" "as it becomes safe to resume more consular operations at each U.S. mission."  Id. (quoting U.S. Dep't of State — Bureau of Consular Affairs, Important Notice for K visa applicants affected by COVID-19 (August 31, 2020), https://bit.ly/38ByQKM).

Even with this prioritization, however, Defendants' efforts to resume full visa processing have been hampered by factors ranging from host-country government restrictions (such as mandatory quarantines, regulations of public movement, and limits on public gatherings) to decreased staffing levels (given illness of employees and their family members).  Id., ¶ 8 (discussing necessary partial or complete closures of U.S. Embassies or Consulates in some countries and inability to schedule case interviews due to government restrictions in others); see also Grewe Decl., ¶ 4 ("In August [2020], only 39 of 143 [U.S. Embassies and Consulates] were

able to schedule at least one [immigrant visa] interview during the month."). Whatever the cause, Plaintiffs still await adjudication of their visas.

D.  Procedural History

Seeking to break the logjam, Plaintiffs filed this suit on September 17, 2020, see ECF No. 1, and subsequently filed an Amended Complaint on October 9, 2020. They contend that the State Department's reliance on the Presidential Proclamations to deny visa processing in the Proclamation countries is *ultra vires* and violates the APA. They also argue that State's delayed processing of K-1 visa applications in all countries is arbitrary and capricious and constitutes agency action unlawfully withheld. Further, they raise a notice-and-comment claim regarding State's decision to suspend visa issuances.

Plaintiffs moved for a preliminary injunction and temporary restraining order on September 29, 2020. In that Motion, Proclamation Plaintiffs ask this Court to issue relief that includes enjoining State's suspension of K-1 visa issuances or, in the alternative, ordering it to grant Plaintiffs a national-interest exception to the Proclamations. See ECF No. 5 at 1–2. In addition, Plaintiffs ask the Court to order the State Department to immediately reissue visas to those Plaintiffs whose visas have expired during the pandemic and, generally, to order expeditious processing of visas. Id. Following the completion of briefing of Plaintiffs' Motion, the Court held a hearing on October 22, and it ordered the parties to file supplemental briefing on the number and location of K-1 visas that the State Department had processed during the pandemic. The parties did so, see ECF No. 13 (Pl. Supp.); ECF No. 14 (Gov. Supp.), and this Opinion now follows.

## II.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. NRDC, 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must "make a 'clear

showing that four factors, taken together, warrant relief: likely success on the merits, likely

irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and

accord with the public interest.'"  League of Women Voters of United States v. Newby, 838 F.3d

1, 6 (D.C. Cir. 2016) (quoting Pursuing America's Greatness v. FEC, 831 F.3d 500, 505 (D.C.

Cir. 2016)).  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear

showing,' that the requested relief is warranted."  Hospitality Staffing Solutions, LLC v. Reyes,

736 F. Supp. 2d 192, 197 (D.D.C. 2010) (citing Chaplaincy of Full Gospel Churches v. England,

454 F.3d 290, 297 (D.C. Cir. 2006)).

Historically, this Circuit has evaluated the preliminary-injunction factors on a "sliding

scale," under which if the "movant makes an unusually strong showing on one of the factors,

then it does not necessarily have to make as strong a showing on another factor."  Davis v.

Pension Ben. Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  This Circuit has hinted,

though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable

harm" standard — should be read to abandon the sliding-scale approach in favor of requiring that

"likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing

requirement[s].'"  Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (quoting Davis,

571 F.3d at 1296 (Kavanaugh, J., concurring)); see Singh v. Carter, 185 F. Supp. 3d 11, 16–17

(D.D.C. 2016) (calling "sliding scale approach" "highly questionable" after Winter and requiring

plaintiff to "bear[] the burden of persuasion on all four preliminary injunction factors"); League

of Women Voters, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid

after Winter).  Unresolved, too, is the related question of "whether, in cases where the other three

factors strongly favor issuing an injunction, a plaintiff need only raise a serious legal question on

the merits."  Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation and

citation omitted).

Regardless of the extent to which showings of irreparable harm and success on the merits

can be diminished, some fundamentals of the four-factor test bear reiterating.  Because "the basis

of injunctive relief has always been irreparable harm," Chaplaincy of Full Gospel, 454 F.3d at

297, a plaintiff must, at a minimum, "demonstrate that irreparable injury is likely in the absence

of an injunction," not just that injury is a "possibility."  Winter, 555 U.S. at 21 (emphasis

omitted); see Davis, 571 F.3d at 1292.  Before and after Winter, similarly, this Circuit has

required plaintiffs to demonstrate a "substantial likelihood" of success to obtain relief.  See

Pursuing America's Greatness, 831 F.3d at 505.  Where a plaintiff cannot show either harm or

success, no relief is warranted.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,

205 F. Supp. 3d 4, 26 (D.D.C. 2016); see also Ark. Dairy Co-op Ass'n, Inc. v. USDA, 573 F.3d

815, 832 (D.C. Cir. 2009) (denying injunction when plaintiff shows "no likelihood of success").

## III.    Analysis

In the hearing on Plaintiffs' Motion, the parties agreed that there were two essential

merits questions for the Court to address.  First, is the State Department's visa suspension

unlawful as to Proclamation Plaintiffs?  Second, is non-Proclamation Plaintiffs' delay claim

valid?  The Court now separately considers those two issues before examining the remaining

injunction factors.

A.  <u>Likelihood of Success</u>

    1.  *Proclamation Plaintiffs and Section 1182(f)*

Plaintiffs initially focus on visa adjudication in the Proclamation countries.  They do not

challenge the Proclamations themselves, but argue instead that State's reliance on the

Proclamations and on section 1182(f) to suspend visa processing violates the APA.  <u>See</u> 5 U.S.C.

§ 706(2)(C) (permitting courts to "hold unlawful and set aside agency action . . . in excess of . . .

authority"); <u>id.</u> § 706(2)(A) (same for "agency action . . . found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law"); <u>see also</u> PI Mot. at 21, 25; ECF

No. 11 (Reply) at 3–4.

Central to their argument is the text of section 1182(f), on which the Proclamations

expressly rely, which provides:

> Whenever the President finds that the entry of any aliens or of any
> class of aliens into the United States would be detrimental to the
> interests of the United States, he may by proclamation, and for such
> period as he shall deem necessary, <u>suspend the entry</u> of all aliens or
> any class of aliens as immigrants or nonimmigrants . . . .

8 U.S.C. § 1182(f) (emphasis added).  Plaintiffs contend that while the provision confers upon

the President authority to "suspend the <u>entry</u> of certain aliens into the United States . . . , [i]t does

not authorize [him] to suspend the <u>issuance of visas</u>."  Am. Compl., ¶ 279 (second emphasis

added); PI Mot. at 21, 25.  They embrace the logic of Judge Amit Mehta's recent decision from

this district in <u>Gomez v. Trump</u>, No. 20-1419, 2020 WL 5367010 (D.D.C. Sept. 4, 2020),

<u>amended in part</u>, No. 20-1419, 2020 WL 5886855 (D.D.C. Sept. 14, 2020), in which he

explained that a contrary conclusion would "ignore[] 'the basic distinction between admissibility

determinations,' i.e., entry determinations, and 'visa issuance that runs throughout the INA.'"  <u>Id.</u>

at *27 (quoting <u>Hawaii v. Trump</u>, 138 S. Ct. 2392, 2414 & n.3 (2018)).  Because eligibility for

visas and for entry are distinct concepts and because section 1182(f) only renders individuals

ineligible to <u>enter</u>, Plaintiffs believe that State lacked authority to suspend visa adjudications.
<u>See</u> PI Mot. at 21, 25.  In practical terms, Plaintiffs understand that receipt of a visa does not
entitle them to enter the U.S. from a Proclamation country, but they wish to possess the visas in
expectation of reopening or to attempt entry (after quarantining) from a non-Proclamation
country.

Defendants first maintain that this Court should not even reach Plaintiffs' textual
argument because they lack a cause of action under the APA to challenge State's implementation
of the Proclamations.  <u>See</u> Opp. at 34–36.  They argue that "[a]ctions" — seemingly, <u>all</u> actions
— "taken by an executive branch agency to implement a Presidential Proclamation, pursuant to a
discretionary authority that was committed to the President, are unreviewable under the APA."
<u>Id.</u> at 34; <u>see also</u> <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 801 (1992) (finding President's
actions "not subject to [the APA's] requirements").  While the Circuit has not been perfectly
clear on where to draw the line as to which agency actions are reviewable, <u>see</u> <u>Moghaddam v.
Pompeo</u>, 424 F. Supp. 3d 104, 120 (D.D.C. 2020), Defendants' broad contention cannot be
squared with its prior statements.  <u>See</u> <u>Chamber of Com. v. Reich</u>, 74 F.3d 1322, 1327 (D.C. Cir.
1996) (expressing doubt that agency regulations that implemented executive order, which was
issued pursuant to discretionary authority committed to President, would be insulated from
review under APA); <u>Public Citizen v. U.S. Trade Rep.</u>, 5 F.3d 549, 552 (D.C. Cir. 1993)
("<u>Franklin</u> is limited to those cases in which the President has final constitutional or statutory
responsibility for the final step necessary for the agency action directly to affect the parties");
<u>Hawaii v. Trump</u>, 878 F.3d 662, 681 (9th Cir. 2017) ("[B]ecause these agencies have
'consummat[ed]' their implementation of the Proclamation, from which 'legal consequences will
flow,' their actions are 'final' and therefore reviewable under the APA.") (alterations in original)

(quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)), rev'd on other grounds, 138 S. Ct. 2392 (2018); Gomez, 2020 WL 5367010, at *16 ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement Proclamations, they are wrong."); O.A. v. Trump, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) ("The Court, moreover, need not pause over the fact that presidential actions are not themselves subject to APA review . . . because it is the [agency's] Rule, and not the Proclamation, that has operative effect.").

Defendants' reliance on the non-binding case of Detroit International Bridge Co. v. Government of Canada, 189 F. Supp. 3d 85 (D.D.C. 2016), aff'd on other grounds, 875 F.3d 1132 (D.C. Cir. 2017) (subsequent history omitted), does not counsel otherwise. See Opp. at 24–35; Gomez, 2020 WL 5367010, at *16 (concluding same). There, a court in this district found that the State Department's issuance of a permit for a bridge was unreviewable under the APA. Detroit Int'l Bridge Co., 189 F. Supp. 3d at 100–02. In that case, Congress had delegated to the President power over final approvals of such bridges, the President approved the bridge, and State's actions were mere "ministerial implementation of presidential action." Gomez, 2020 WL 5367010, at *16; see also Detroit Int'l Bridge Co., 189 F. Supp. 3d at 100–02.

While the Court understands that some agency actions are non-reviewable, its decision as whether State's actions here fall within that presumably small world turns on whether the Proclamations direct it to suspend visa adjudications. Because the Proclamations mandate that "entry . . . [is] suspended," determining whether they also mandate a visa-adjudication suspension requires the Court to address the parties' dispute over whether the word "entry" includes "visa issuances." The Court agrees with Plaintiffs that it does not. As the Supreme Court itself has noted, "The concepts of entry and admission — but not issuance of a visa — are used interchangeably in the INA." Hawaii, 138 S. Ct. at 2414 n.4; see, e.g., 8 U.S.C. § 1101

(defining "application for admission" as having "reference to the application for admission into the United States and not to the application for the issuance for an immigrant or nonimmigrant visa").  State's  action — suspending visa adjudications when the Proclamation merely directs the suspension of "entry" — thus required the agency to exercise its judgment.  The President's direction to State to "implement [each Proclamation] as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish," e.g., Proclamation No. 9984, 85 Fed. Reg. at 6,711 (Section 3), serves to highlight that State's action is more than ministerial; the President left it to determine how the Proclamations relate to visas.

That bridge crossed, and State's suspension of visa adjudications thus reviewable, the Court may turn to the merits of the claim.  Here, the parties' dispute turns on whether and how section 1182(a) relates to section 1182(f), the subsection that allows the President to suspend "entry."  Section 1182(a) states, "Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States."  8 U.S.C. 1182(a) (emphasis added).  Defendants explain that Plaintiffs are "inadmissible" under a "following paragraph" — namely, section 1182(f) — and thus are not only "ineligible to be admitted" but are also "ineligible to receive visas."  Opp. at 16–17.  Because consular officers cannot issue a visa to any alien who "is ineligible to receive a visa . . . under section 1182," 8 U.S.C. 1201(g) (emphasis added), and because the INA contains "no exceptions . . . that would lawfully permit a consular officer to issue a visa to an applicant who was determined to be inadmissible," Defendants maintain that State has properly suspended visa adjudications.  See Opp. at 17.

As Judge Mehta concluded in <u>Gomez</u>, however, sections 1201(g) and 1182(<u>a</u>) do not authorize State to suspend visa adjudications when the President suspends entry.  <u>Gomez</u> explains that section 1182(<u>a</u>)'s use of "the following paragraphs" does not include section 1182(<u>f</u>).  <u>See</u> 2020 WL 5367010, at *27.  Indeed, "[s]ection 1182 of the INA carefully distinguishes between <u>subsections</u>, which include §§ 1182(a) and 1182(f), and <u>paragraphs</u>, which are subunits of those subsections."  <u>Id.</u>  Section 1182(a)'s use of "the following paragraphs," then, references "only the ten paragraphs of § 1182(a); [it does] not also include § 1182(f)," which is "a distinct subsection of § 1182."  <u>Id.</u>  So, "a person who falls into one of the categories of inadmissible persons outlined in § 1182(a) is both ineligible to enter the country and ineligible to receive a visa pursuant to § 1201(g)."  <u>Id.</u> (emphasis omitted); <u>see also id.</u> ("The categories of persons deemed ineligible to receive a visa pursuant to § 1201(g) appear in § 1182(<u>a</u>), not § 1182(<u>f</u>).") (emphasis added) (citing <u>Castanada-Gonzalez v. Immigr. & Naturalization Serv.</u>, 564 F.2d 417, 426 (D.C. Cir. 1977), which explained that section 1201(g) "directs [consular officers] not to issue visas to any alien who falls within one of the excludable classes described in [8 U.S.C. § 1182(a)]").  But a person who falls within a Presidential Proclamation issued pursuant to section 1182(f) is merely ineligible to enter.  <u>Id.</u>; <u>see also</u> Am. Compl., ¶¶ 279, 292; <u>see also</u> PI Mot. at 21, 25.  The Court finds Judge Mehta's interpretation persuasive and adopts it here.

Not out of ammunition, Defendants next argue that <u>Gomez</u> "warrants reexamination" because the opinion "did not consider the interplay between" section 1182(f) and a portion of the State Department's Foreign Affairs Manual.  <u>See</u> Opp. at 18 n.7 (citing 9 FAM 301.4-1); <u>see also</u> <u>Gomez</u>, 2020 WL 5367010, at *27 n.20.  Entitled "Overview of Grounds for Refusal," that section of the Manual lists a 2017 Presidential Proclamation, which was issued pursuant to

section 1182(f) and suspended entry of foreign nationals from seven countries, as a basis for refusal. See 9 FAM 301.4-1(c)(14)(i) (citing Proclamation No. 9,645, 82 Fed. Reg. 45,161 (Sept. 24, 2017), which suspended entry of many nationals of Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia); see also 9 FAM 302.14-10(B)(1) (explaining that "issuance of visas to nationals" subject to Proclamation No. 9,645 "is suspended") (emphasis added); cf. Hawaii, 138 S. Ct. at 2404–05 (describing Proclamation No. 9,645). As the State Department contends, its "practice . . . has thus been to refuse aliens covered by Presidential orders under § 1182(f) as ineligible for visas." Opp. at 17. Given the clarity of section 1182(f), however, this Court finds no basis to defer to State's practice, however well established it may be. See Opp. at 19 (citing Proclamations State contends "clearly envision enforcement . . . through visa refusals"); id. at 20 (collecting State Department reports that note visa refusals pursuant to section 1182(f)).

Defendants also contend that Gomez did not consider "other arguments raised" in their brief submitted to this Court, see Opp. at 18 n.7, but they never identify which arguments those are. They rely on cases that reference visa denials under section 1182(f), but identify none where a court expressly concluded that "entry" encompasses visa determinations. See Opp. at 21 & n.8. They also point to yet another provision of the INA, which makes it unlawful "for any alien to . . . enter or attempt to . . . enter the United States" in violation of Proclamations, see 8 U.S.C. § 1185(a)(1) (emphasis added), and upon which the President relied in issuing the Proclamations relevant to this case. Because it is illegal for anyone subject to a Proclamation to attempt entry, Defendants contend that consular officers who issue visas to such individuals will violate federal law by authorizing those foreigners to do so. See Opp. at 22. Defendants' own argument undercuts this claim, however, as they recognize that receipt of a visa merely "confers upon an

alien <u>authorization</u> to attempt lawful entry into the United States." <u>Id.</u> (emphasis added).  In

other words, Defendants do not argue that either application for or receipt of a visa is itself an

"attempt to . . . enter" in violation of section 1185(a)(1).  Of course, after receiving a visa, an

individual's subsequent attempt to enter the United States may be unlawful if he travels from a

Proclamation country.  But a person who receives a visa can enter the United States without

violating a Proclamation — namely, by first quarantining for 14 days in a non-Proclamation

country — and thus can attempt entry without violating section 1185(a)(1).  Plaintiffs here may

very well act in this fashion if and when they finally obtain their visas.  <u>See</u> PI Mot. at 3.

Finally, the Court acknowledges Defendants' concern that "requiring consular officers to

issue visas to aliens subject to presidential exclusion orders under section 1182(f) would create

unnecessary confusion and could lead to screening errors of aliens whose presence in the United

States may compromise national security."  Opp. at 22.  The Court, however, takes no position

on whether the Defendants <u>must issue</u> visas to each Plaintiff named in this suit.  Nor does it

decide whether other provisions of the INA, not briefed in this case, enable State to deny visas or

suspend their issuances.  It merely concludes that Plaintiffs have demonstrated a likelihood of

success on this claim, as State's reliance on section 1182(f) to suspend processing K-1 visas is

unlawful.

## 2.   *Non-Proclamation Plaintiffs and Unreasonable Delay*

While Proclamation Plaintiffs thus complain that State is not issuing them any visas, non-

Proclamation Plaintiffs have an entirely separate beef: State has unreasonably <u>delayed</u> the

adjudication and issuance of K-1 visas in non-Proclamation countries during the pandemic,

despite continuing to process different visas for students, business visitors, and others.  <u>See</u> PI

Mot. at 24–25.  This delay, Plaintiffs contend, violates the APA, which requires agencies to

"conclude" matters presented to them "within a reasonable time," 5 U.S.C. § 555(b), and directs courts to "compel agency action . . . unreasonably delayed." Id. § 706(1). As "[t]hese [APA] provisions give courts authority to review ongoing agency proceedings to ensure that they resolve the questions in issue within a reasonable time," Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin., 740 F.2d 21, 32 (D.C. Cir. 1984), Plaintiffs seek an order compelling State to process, issue, and as necessary, reissue K-1 visas. See ECF No. 5-1 (Pl. Proposed Order) at 1–2.

As a threshold matter, Defendants invoke the doctrine of consular non-reviewability, which "holds that a consular official's decision to issue or withhold a visa is not subject to judicial review." Saavedra Bruno v. Albright, 197 F.3d 1153, 1156 (D.C. Cir. 1999). "[T]he doctrine," however, "is not triggered until a consular officer has made a decision with respect to a particular visa application." Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Kerry, 168 F. Supp. 3d 268, 290 (D.D.C. 2016). It is therefore inapplicable to this claim, as Plaintiffs do not seek review of any decision but instead of "the Government's failure to decide." Id. at 292; see also Bagherian v. Pompeo, 442 F. Supp. 3d 87, 93 (D.D.C. 2020) (collecting cases).

Proceeding to the merits of the APA claim, the Government does not dispute that K-1 visa issuance in non-Proclamation countries has been delayed during the pandemic. But it contends that the delay is not unreasonable because: (1) its "processing ratio of K-1 nonimmigrant visas to other nonimmigrant visas before COVID-19 and now is comparable"; (2) it "has steadily increased the number of K visas adjudicated"; and (3) as of August 31, it authorized consular posts "to give K visa cases high priority." Opp. at 23 (emphasis omitted).

In determining whether State's failure to promptly adjudicate and issue visas is "so egregious" as to warrant relief, the Court turns, as it must, to the six-factor inquiry set out in Telecommunications Research & Action Center v. FCC (TRAC), 750 F.2d 70 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a rule of reason;
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

Id. at 80 (internal quotations, citations, and emphasis omitted); see also Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (applying TRAC to unreasonable-delay claim under section 706(1)). These factors "are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'" In re Core Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting TRAC, 750 F.2d at 80). Indeed, "[e]ach case must be analyzed according to its own unique circumstances," as each "will present its own slightly different set of factors to consider." Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Board, 750 F.2d 81, 86 (D.C. Cir. 1984). Analyzed collectively here, the factors do not weigh in favor of granting relief.

The first two factors, typically considered together, support Defendants to some degree. Whether the State Department has a "rule of reason" "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be

unlawful, but will depend in large part . . . upon the complexity of the task at hand, the

significance (and permanence) of the outcome, and the resources available to the agency."

Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1102.

   Plaintiffs argue that Congress has made clear that family unification should be a priority

in immigration law. See Reply at 12–13 (citing 136 Cong. Rec. H 8629-02 (1990)). Even if

true, the legislature did not translate this policy preference into a specific timeline. While

Congress required the State Department to have a policy of adjudicating K-1 visas "within 30

days of the receipt of all necessary documents from the applicant and the Immigration and

Naturalization Service," Consolidated Appropriations Act, 2000, Pub. L. 106-113, § 237(a), 113

Stat. 1051 (Nov. 29, 1999), it did not mandate a statutory deadline for K-1 visa adjudications.

See, e.g., Agua Caliente Band of Cahuilla Indians v. Mnuchin, No. 20-1136, 2020 WL 2331774,

at *6 (D.D.C. May 11, 2020) (finding congressionally supplied rule of reason when statute

mandated that Department of Treasury "shall pay" qualifying Tribal governments "not later than

30 days after" March 27, 2020); see also Gomez, 2020 WL 5367010, at *30 (finding statute's

"absolute, unyielding deadline by which [visa-lottery] selectees must receive their visas"

manifested congressional intent that State Department "undertake good-faith efforts" to process

such visas before deadline). Rather, the 30-day timeline implemented in the State Department's

Manual is merely what it asks itself to "strive to meet." 9 FAM 502.7-3(C)(2). Separately, the

Court questions whether the Manual provides much guidance in this case, as the 30-day time

clock appears to begin only after the consular office has received all information, including

answers from the interview. Id. Few fiancé(e)s, however, have yet proceeded that far. See Am.

Compl., ¶¶ 34–40 (indicating that no more than five foreign-born fiancé(e)s in non-Proclamation

countries have completed interviews and await initial K-1 visa issuance).

"Absent a congressionally supplied yardstick, courts typically turn to case law as a guide." Sarlak v. Pompeo, No. 20-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020). The Court notes that "Congress has given [the State Department and other agencies] wide discretion in the area of immigration processing." Skalka v. Kelly, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017). While "[t]here is 'no per se rule as to how long is too long' to wait for agency action,'" In re Am. Rivers & Idaho Rivers United, 372 F.3d 413, 419 (D.C. Cir. 2004) (quoting In re Int'l Chem. Workers Union, 958 F.2d 1144, 1149 (D.C. Cir. 1992)), "[d]istrict courts have generally found that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable." Sarlak, 2020 WL 3082018, at *6 (citation omitted) (collecting cases). While some, or even many, Plaintiffs may have filed for visas long before the pandemic took hold, see Pl. Supp. at 7 n.1, Plaintiffs collectively target delays that began eight months ago, in March, when U.S. Embassies and Consulates around the world shut down. This timeline alone provides no basis for judicial intervention.

Still, Plaintiffs contend that the delays they face are unreasonable because other individuals, including foreign-born spouses, students, and business visitors, are receiving visas. See PI Mot. at 24; Reply at 10–11. They acknowledge that there is not a total ban on K-1 visa processing in non-Proclamation countries, see Pl. Supp. at 3, but maintain that the visa adjudications are being unlawfully withheld because State is not "devoting the same proportion of resources to K visa issuances" as it had done before COVID-19. Id. at 2 (emphasis added). Plaintiffs point to particular U.S. Embassies and Consulates — namely, Ciudad Juarez, Bangkok, Montreal, and Jakarta — where the relative number of K-visas issued per month, as compared to immigrant visas, is lower in 2020 than it was in 2019. Id. at 4–6. Defendants respond that Plaintiffs' cherry-picked cities are not representative of the worldwide realities of visa

processing, see Def. Supp. at 5 (citing cities with higher numbers of K-1 visas processed per time

period than in 2019), and do not capture the resource constraints that the State Department must

navigate.  See, e.g., Def. Supp. at 4–6; Marwaha Decl., ¶ 8.  Nor, Defendants point out, do the

statistics capture the State Department's need to divert resources to the processing of diversity

visas in order to comply with another court's order.  See Def. Supp. at 4 (discussing Gomez).

Given these constraints, the Court finds no basis to conclude that State's timetable for processing

K-1 visas around the globe — at least, as of now — lacks some reason.

The third and fifth factors identified in TRAC, which both consider the effects of delay,

run together in this case and favor Plaintiffs.  The third looks to whether "human health and

welfare are at stake"— in which case judicial intervention is more justified — and the fifth

assesses the "nature and extent of the interests prejudiced by delay."  TRAC, 750 F.2d at 80.

Plaintiffs' "health and welfare are at stake because the delay in adjudicating" the K-1 visas has

forced many of them "to endure a prolonged and indefinite separation" from their fiancé(e)s.

Didban v. Pompeo, 435 F. Supp. 3d 168, 177 (D.D.C. 2020).  Many report that they are suffering

from depression as their indefinite separation wears on, e.g., ECF No. 8-8 at 400–01 (Affidavit

of S.G.); ECF No. 8-7 at 2 (Affidavit of R.Y.), and they worry about the effects the separation is

having on their children and future step-children.  E.g., ECF No. 8-8 at 369 (Affidavit of T.G.).

The Court acknowledges that the State Department's current delays are "intended to safeguard

the health and welfare of U.S. mission staff and the public," Opp. at 27, but concludes that

Plaintiffs face significant consequences without intervention.

The fourth factor —"the effect of expediting delayed action on agency activities of a

higher or competing priority," TRAC, 750 F.2d at 80 — supports Defendants' position.  This

factor carries the greatest weight in many cases, and it does so here.  Plaintiffs do not contest that

State faces an incredible backlog of visas across posts in countries with varied COVID rates and restrictions.  As other courts have noted, delays stemming from resource-allocation decisions simply do not lend themselves to "judicial 'reordering[s] [of] agency priorities.'"  Bagherian, 2020 WL 674778, at *6 (alterations in original) (quoting In re Barr Labs., Inc., 930 F.2d 72, 76 (D.C. Cir. 1991)); see also Sarlak, 2020 WL 3082018, at *6.  This Circuit has "refused to grant relief, even [though] all the other factors considered in TRAC favored it, where 'a judicial order putting [the petitioner] at the head of the queue [would] simply move[] all others back one space and produce[] no net gain.'"  Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100 (alteration in original) (quoting Barr Labs, 930 F.2d at 75).  The Order Plaintiffs ask this Court to issue would do just that.  This factor thus strongly favors Defendants.

Finally, to the extent the sixth TRAC factor bears on this case, "the good faith of the agency in addressing the delay weighs against" equitable relief.  See Liberty Fund, Inc. v. Chao, 394 F. Supp. 2d 105, 120 (D.D.C. 2005) (citing In Re Am. Fed'n of Gov't Employees, 837 F.2d 503, 507 (D.C. Cir. 1988)).  Plaintiffs criticize Defendants' efforts and prioritization, but they make no allegations of impropriety.  The Court, moreover, sees no basis to conclude that Defendants have been "twiddl[ing] their thumbs."  Barr Labs, 930 F.2d at 75 (alteration in original) (quoting Board of Trade v. SEC, 883 F.2d 525, 531 (7th Cir. 1989)).

A careful balancing of all six factors, accordingly, leads the Court to conclude that the State Department's delay does not warrant judicial intervention at this juncture.  See Sarlak, 2020 WL 3082018, at *6 (collecting cases).  The Court sympathizes with the frustrating and often painful situations Plaintiffs are enduring, but it believes that "the government's interests in balancing its own priorities," in ensuring careful vetting, and in navigating the varied challenges this global pandemic presents outweigh Plaintiffs' interests in an immediate adjudication of their

visas.  See Bagherian, 2020 WL 674778, at *6.  While it does not provide relief at this time, the

Court does not rule out that its calculus could change if the delays continue for a more extended

period.  Nor does this ruling preclude individual Plaintiffs, some of whom may be facing more

extended application timelines, from contesting the lawfulness of those delays.

      B.  Irreparable Harm

As set forth above, in addition to showing likelihood of success, a party seeking a

preliminary injunction must demonstrate that its injury is "of such imminence that there is a clear

and present need for equitable relief to prevent irreparable harm."  Chaplaincy of Full Gospel

Churches, 454 F.3d at 297 (internal quotation marks and emphasis omitted) (quoting Wis. Gas

Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The injury must also be "both certain and

great; it must be actual and not theoretical."  Id. (quoting Wis. Gas Co., 758 F.2d at 674).

Finally, the injury must be "beyond remediation."  Id.  Because the Court found no likelihood of

success on non-Proclamation Plaintiffs' unlawful-delay claim, it need only analyze this prong of

the preliminary-injunction standard as related to Proclamation Plaintiffs' section 1182(f) claim.

The Court finds little reason to debate this prong.  Without K-1 visas, Plaintiffs explain

that they have and will continue to suffer not only the financial and emotional strains of their

long-distance relationships and of navigating uncertainty regarding their visas and futures, see,

e.g., ECF No. 8-2 at 59–62 (Affidavit of G.G.); ECF No. 8-8 at 68 (Affidavit of M.F.), but they

have missed and will continue to miss significant life events, including birthdays, anniversaries,

family funerals, and holidays.  See, e.g., ECF No. 8-1 at 61 (Affidavit of P.A.); id. at 172

(Affidavit of O.H.); ECF No. 8-8 at 352 (Affidavit of S.G.).  Because of the visa barriers, some

Plaintiffs have yet to meet their own children, see ECF No. 8-1 at 319 (Affidavit of B.B.), some

have been unable to help raise their future step-children, see ECF No. 8-8 at 152 (Affidavit of

R.P.); <u>id.</u> at 369 (Affidavit of T.G.); and some worry that, as they continue to age and their fertility decreases, they may not be able to have children together.  <u>See, e.g.</u>, ECF No. 8-7 at 257 (Affidavit of W.B.P.); ECF No. 8-1 at 67–69 (Affidavit of A.N.); <u>id.</u> at 141–43 (Affidavit of A.S.A.).  Plaintiffs, moreover, have been unable to support one another through everything from pregnancies, <u>see</u> ECF No. 8-8 at 2–3 (Affidavits of K.L.P); <u>id.</u> at 4 (Affidavit of C.H.), to cancer. <u>See</u> ECF No. 8-7 at 301 (Affidavit of S.M.).  While some have been able to meet up outside of the United States, many have not and face harm to their relationships.  <u>See</u> ECF No. 8-8 at 197 (Affidavit of S.C.); <u>id.</u> at 383 (Affidavit of P.H.).  With no end in sight, Plaintiffs cannot plan their lives, let alone their weddings, <u>see</u> ECF No. 8-1 at 16 (Affidavit of A.R.M.); <u>id.</u> at 900 (Affidavit of E.T.), and worry that elderly family members may not live long enough to celebrate their eventual marriages.  <u>See</u> ECF No. 8-1 at 96 (Affidavit of A.M.).

Defendants' response essentially ignores the seriousness of Plaintiffs' harms.  They contend that Plaintiffs cannot demonstrate irreparable harm because the Constitution does not guarantee foreign nationals the right to reside with family in America and because Plaintiffs' ability to reunite is not forever foreclosed.  <u>See</u> Opp. at 37–38.  But irreparable harm does not necessarily require deprivations of constitutional rights or permanence, and "separation from family members" is an "important irreparable harm factor[]."  <u>Leiva-Perez v. Holder</u>, 640 F.3d 962, 969–70 (9th Cir. 2011) (cleaned up) (quoting <u>Andreiu v. Ashcroft</u>, 253 F.3d 477, 484 (9th Cir. 2001) (<em>en banc</em>)).  Separately, Defendants contend that Plaintiffs do not face irreparable harm because other families who seek different visas also face separations for reasons unrelated to the Proclamations.  <u>See</u> Opp. at 37 (discussing congressionally mandated annual caps on number of family-based immigrant visas granted).  The mere fact that other people, unnamed in this suit, are in similar situations does not render Plaintiffs' harms less real.  Courts do not

compare the amount of harm a plaintiff is suffering with that inflicted on some third person.

Finally, Defendants argue that Plaintiffs cannot show irreparable harm because they have

provided no evidence that a consular officer will grant each of their visa applications.  Id. at 37–

38 & n.10.  The K-1 visa-approval rating, however, is actually high, see U.S. Dep't of State —

Bureau of Consular Affairs, Worldwide NIV Workload by Visa Category FY 2019 (last visited

Nov. 12, 2020), https://bit.ly/3ksPXAS (K-1 visa-approval rate almost 80% in 2019), and even

for those Plaintiffs whose visas are ultimately denied, knowledge of the decision will allow them

to more concretely plan their futures.

     C.  Balance of Equities and Public Interest

The last factors, which the Court considers together, examine "the balance of equities"

and "the public interest."  Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20); see also

League of Women Voters, 838 F.3d at 12.  When the non-moving party is the Government, these

two considerations merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Again, the Court

need only consider this standard as related to Proclamation Plaintiffs' section 1182(f) claim.

Defendants' contentions do not counterbalance Plaintiffs' harms.  They posit that

"significant . . . practical problems" — namely, consular officers' issuing of visas to individuals

with an "annotation" that they cannot enter the country and individuals' receipt of visas that will

expire before a proclamation is revoked — may result from a proper application of section

1182(f).  See Opp. at 39–41.  But this alleged problem is neither new to immigration officers nor

unique to this Court's understanding of section 1182(f).  Indeed, as the Supreme Court

recognized in Trump v. Hawaii, "[E]ven if a consular officer issues a visa," that "visa does not

entitle an alien to enter the United States 'if, upon arrival,' an immigration officer determines

that the applicant is 'inadmissible under [the INA], or any other provision of law' — including

25

§ 1182(f)."  138 S. Ct. at 2414 (quoting 8 U.S.C. § 1201(h)).  Nor are the practical problems as great as the Government contends in this case, as Proclamation Plaintiffs acknowledge that they must quarantine in a non-Proclamation country for 14 days before attempting to enter the United States on a K-1 visa in order to avoid the section 1182(f) bar.  See PI Mot. at 3.  Such problems, moreover, do not outweigh the public interest in avoiding the separation of families, see, e.g., Washington v. Trump, 847 F.3d 1151, 1169 (9th Cir. 2017); Pickett v. Hous. Auth. of Cook Cty., 114 F. Supp. 3d 663, 673 (N.D. Ill. 2015), and in the federal government's compliance with the law.  See, e.g., League of Women Voters, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."); Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs., No. 20-1630, 2020 WL 5232076, at *42 (D.D.C. Sept. 2, 2020).

## IV.    Conclusion

Because Plaintiffs have shown that a preliminary injunction is warranted on their section 1182(f)-related claim, the Court will enjoin the State Department from relying on the Presidential Proclamations to suspend all visa adjudications for Proclamation Plaintiffs.  The Court, consequently, will issue a contemporaneous Order granting in part and denying in part Plaintiffs' Motion for a Preliminary Injunction.

/s/ _James E. Boasberg_
JAMES E. BOASBERG
United States District Judge

Date:  November 19, 2020