**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DANIEL MILLIGAN,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 20-2631 (JEB)** |
| **ANTONY BLINKEN, Secretary of State,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are American citizens and their non-citizen fiancé(e)s seeking visas for the latter to come to the U.S.  The COVID-19 pandemic disrupted the State Department's ordinary visa processing and created the conditions underlying the dispute here.  Some Plaintiffs could not receive visas when this suit was filed because State interpreted several pandemic-related Presidential Proclamations to prohibit the issuance of certain visas for people in listed countries. Other Plaintiffs were never subject to the Proclamations, yet they have nonetheless experienced pandemic-related delays in visa processing that they believe are excessive.

In November 2020, this Court granted in part and denied in part Plaintiffs' motion for a preliminary injunction, enjoining State from improperly relying on the Proclamations in refusing to issue visas, but finding that its delay in processing visas in non-Proclamation countries was likely not unreasonable.  Defendants now move to dismiss.  Because the Secretary of State's grant of a national-interest exception during the pendency of this case has mooted Plaintiffs' claims involving the Proclamations and Defendants' delay is still not unreasonable, the Court will grant the Motion.

## I.   Background

The Court will first give an overview of the process for obtaining a fiancé(e) visa and then turn to the background of Plaintiffs' claims and the procedural history of the case.  Having already provided much of this detail in its PI Opinion, the Court truncates its description here, but elaborates on new developments since that Opinion.  See Milligan v. Pompeo, 502 F. Supp. 3d 302, 308–11 (D.D.C. 2020).

A.   Fiancé(e) Visas

The fiancé(e) visa, also known as a K-1 visa, is a nonimmigrant visa that allows a foreign citizen to travel to the U.S. to marry his or her U.S.-citizen fiancé(e) and then apply for lawful-permanent-resident status.  See U.S. Dep't of Homeland Sec., Visas for Fiancé(e)s of U.S. Citizens (March 23, 2018), https://bit.ly/35j9Jup (USCIS Fiancé(e) Visa Information).  The fiancé(e) visa is a type of K visa, others of which are available to foreign spouses and children of fiancé(e)s and spouses.  To obtain a K-1 visa, the U.S.-citizen fiancé(e) must submit a Petition for Alien Fiancé(e) with United States Citizenship and Immigration Services.  Id.; see also U.S. Dep't of Homeland Sec., Petition for Alien Fiancé(e) (July 23, 2020), https://bit.ly/3eJ57k5. Once USCIS determines that the U.S. citizen has established the foreign fiancé(e)'s visa eligibility, it sends the application to the State Department's National Visa Center (NVC) for further processing.  See USCIS Fiancé(e) Visa Information.  After NVC receives an approved application from USCIS, it creates a case in the State Department's electronic application system.  See U.S. Dep't of State, Step 2: Begin National Visa Center (NVC) Processing (last visited Sept. 2, 2021), https://bit.ly/2JKANtW.  The NVC then forwards the case to the U.S. Embassy or Consulate where the foreign fiancé(e) will apply and interview for a K-1 visa.  Id.

Upon receiving the case, the U.S. Embassy or Consulate schedules an interview with the applicant.  See USCIS Fiancé(e) Visa Information.  A State Department consular officer conducts that interview, reviews forms and documentation that the couple has provided, and determines whether the fiancé(e) qualifies for the K-1 visa.  Id.  If the consular officer grants the visa, it is valid for up to six months, but it "does not guarantee admission to the United States." Id.  When admission occurs, the couple has 90 days to get married, and the newly wed, foreign spouse can then apply for a Permanent Resident Card.  Id.

The initial Plaintiffs in this case were over 650 K-1 visa applicants and their U.S. citizen fiancé(e)s.  See ECF No. 8 (Am. Compl.), ¶¶ 21–237; ECF No. 40-1 Exh. A (Bryan M. Giblin Decl.), ¶¶ 2–4.  Since this lawsuit was filed, however, a number of Plaintiffs have asked to be voluntarily dismissed, either because they have been issued a fiancé(e) visa or because they no longer wish to pursue their claims.  See ECF No. 35 (First Motion to Voluntarily Dismiss); ECF No. 43 (Second Motion to Voluntarily Dismiss).  Of the remaining Plaintiffs, just 50 have not yet had their visas adjudicated.  See ECF No. 44 (Joint Status Report, Aug. 27, 2021) at 1.  Six of those Plaintiffs have had an interview scheduled but have not yet received an adjudication, while 33 have not been scheduled for an interview, and 11 either did not show up for a scheduled interview, canceled their interview, or withdrew their application.  Id. at 1, 4.

B.  COVID-19 and Fiancé(e) Visa Processing

The COVID-19 pandemic caused the pace of the State Department's visa processing to decrease dramatically in 2020.  Starting on March 20, the agency "suspended all routine visa services worldwide."  ECF No. 10-1 (Brianne Marwaha Decl.), ¶ 2.  In the early stages of the pandemic, U.S. Embassies and Consulates "continued to provide mission critical or emergency services to the extent they were able to do so."  Id.  Those diplomatic outposts initially

prioritized certain visas, which did not include fiancé(e) visas.  Id.  Then, in July 2020, the State Department announced that consulates would "begin providing additional services, culminating eventually in a complete resumption of routine visa services."  Id., ¶ 3.  In August 2020, the Department advised that as it became safe to resume more consular operations, posts were authorized to give K-visa cases high priority.  See U.S. Dep't of State, Important Notice for K Visa Applicants Affected by COVID-19 (Aug. 31, 2020), https://bit.ly/3sKpm82.

Despite those efforts, in early 2021 there remained a backlog of documentarily qualified applicants in all immigrant visa categories as compared to previous years.  See U.S. Dep't of State, National Visa Center (NVC) Immigrant Visa Backlog Report (Aug. 2021), https://bit.ly/3Bhbfdz.  In April 2021, the State Department announced details about how embassies and consulates were prioritizing immigrant visa applications.  See U.S. Dep't of State, Immigrant Visa Prioritization (Apr. 30, 2021), https://bit.ly/3BcgFXb.  The announcement explained that while "consular sections, where possible, are scheduling some appointments within all four priority tiers every month," the agency had organized visa processing into four "main categories of immigrant visas in priority order."  Id.  Fiancé(e) visas were listed in the second priority tier, together with immediate-relative visas and returning-resident visas.  Id.  The first priority tier consisted of immediate-relative-intercountry-adoption visas, age-out cases (i.e., cases where the applicant will soon no longer qualify due to their age), and certain Special Immigrant Visas for Afghan and Iraqi nationals working with the U.S. government.  Id.

In addition to the delays described above, some Plaintiffs were barred altogether from entering this country.  This was because former President Trump issued five Proclamations in 2020 that restricted the entry of certain immigrants and nonimmigrants from specific countries. See Proclamation No. 9984, 85 Fed. Reg. 6,709 (Jan. 31, 2020) (Republic of China);

Proclamation No. 9992, 85 Fed. Reg. 12,855 (Feb. 29, 2020) (Iran); Proclamation No. 9993, 85

Fed. Reg. 15,045 (Mar. 11, 2020) (Schengen Area); Proclamation No. 9996, 85 Fed. Reg. 15,341

(Mar. 18, 2020) (United Kingdom and Ireland); Proclamation No. 10041, 85 Fed. Reg. 31,933

(May 24, 2020) (Brazil).  While President Trump lifted some of those restrictions shortly before

leaving office, see Proclamation No. 10138, 86 Fed. Reg. 6,799 (Jan. 22, 2021), President Biden

issued a Proclamation days later that renewed and partially expanded the entry restrictions.  See

Proclamation No. 10143, 86 Fed. Reg. 7,467 (Jan. 28, 2021).  In May 2021, President Biden

signed a separate Proclamation further extending the restrictions to encompass nonimmigrant

travelers from India.  See Proclamation No. 10199, 86 Fed. Reg. 24,297 (May 6, 2021).

In each of the Proclamations, however, the President stated that the entry restrictions

would not apply to "any alien whose entry would be in the national interest, as determined by the

Secretary of State, the Secretary of Homeland Security, or their designees."  E.g., 85 Fed. Reg. at

6,710–11.  Important for purposes of this case, on April 8, 2021, the Secretary of State granted

all K-visa applicants a national interest exemption (NIE) under the Proclamations.  See U.S.

Dep't of State, Updates to National Interest Exceptions for Regional COVID Proclamations

(Apr. 8, 2021), https://bit.ly/3kjTljo (Updates to NIE).  As a result, the Proclamations no longer

bar Plaintiffs or any other K-1 visa applicants from receiving visas and entering the U.S.  Id.

C.  Procedural History

Plaintiffs filed this suit on September 17, 2020, see ECF No. 1 (Compl.), and

subsequently filed an Amended Complaint.  They contend that the State Department's reliance

on the Presidential Proclamations to suspend visa processing in countries covered by the

Proclamation was *ultra vires* and violated the Administrative Procedure Act.  Plaintiffs also

maintain that Defendants have unreasonably delayed the processing of K-1 visa applications in all countries, constituting agency action unlawfully withheld under the APA.

Plaintiffs moved for a preliminary injunction on September 29, 2020. See ECF No. 5 (PI Motion). The Court granted in part and denied in part the injunction on November 19. See ECF No. 19 (PI Order); Milligan, 502 F. Supp. 3d at 322. As relevant here, it concluded that: (1) Proclamation Plaintiffs had demonstrated a likelihood of success on the claim that State's reliance on 8 U.S.C. § 1182(f) to suspend processing K-1 visas was unlawful, id. at 316; and (2) Non-Proclamation Plaintiffs had not demonstrated a likelihood of success on their unreasonable-delay claim, id. at 320. The Court thus "enjoin[ed] the State Department from relying on the Presidential Proclamations to suspend all visa adjudications for Proclamation Plaintiffs." Id. at 322. Defendants now move to dismiss Plaintiffs' Amended Complaint. See ECF No. 38 (Def MTD).

## II.    Legal Standard

Defendants' Motion invokes the legal standards for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). When a defendant brings a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the plaintiff generally "bears the burden of establishing jurisdiction by a preponderance of the evidence." Bagherian v. Pompeo, 442 F. Supp. 3d 87, 91–92 (D.D.C. 2020) (quoting Didban v. Pompeo, 435 F. Supp. 3d 168, 172–73 (D.D.C. 2020)); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Unlike many other jurisdictional issues, however, a party asserting mootness bears the burden of establishing that the case is in fact moot. See Honeywell Int'l, Inc. v. NRC, 628 F.3d 568, 576 (D.C. Cir. 2010). This burden remains when the party contends that its voluntary action deprives the court of jurisdiction. In such a case, the party asserting mootness bears the burden of "demonstrating

that there is no reasonable expectation that the wrong will be repeated." Cierco v. Mnuchin, 857

F.3d 407, 415 (D.C. Cir. 2017) (citation omitted).  The Court "assume[s] the truth of all material

factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the

benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co v. FDIC,

642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir.

2005)).

      To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim upon

which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 552 (2007).  Although

"detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555,

"a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief

that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,

550 U.S. at 570).  While a plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is

very remote and unlikely,'" the facts alleged in the complaint "must be enough to raise a right to

relief above the speculative level." Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes,

416 U.S. 232, 236 (1974)).

## III.   Analysis

      Defendants' Motion to Dismiss requires the Court to resolve two central contentions.

First, the Government maintains that the April 2021 NIE granted to K-visa applicants moots

Plaintiffs' claims related to the Proclamations.  Second, it argues that Plaintiffs' unreasonable-

delay claims should be dismissed on the merits.  As the Court agrees with both positions, it need

not address Defendants' ancillary assertions regarding dismissal of certain parties on other

grounds.

A.  Proclamation Claims

"Article III of the Constitution limits [the Court's] jurisdiction to 'actual, ongoing controversies.'"  Foretich v. United States, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (quoting Honig v. Doe, 484 U.S. 305, 317 (1988)).  "A lawsuit becomes moot — and is therefore no longer a 'Case' or 'Controversy' — 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"  Almaqrami v. Pompeo, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting Chafin v. Chafin, 568 U.S. 165, 172 (2013)).  "This happens 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  Zukerman v. United States Postal Serv., 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting Knox v. Serv. Emps. Int'l Union, 567 U.S. 298, 307 (2012)).  If "intervening events make it impossible to grant the prevailing party effective relief," no live controversy remains.  See Lemon v. Geren, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (citation omitted).

1.  *Voluntary Cessation*

Defendants here invoke the doctrine of voluntary cessation and contend that the Secretary of State mooted Plaintiffs' claims relating to the Proclamations by granting the NIE to K-visa applicants.  "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'"  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)).  There is an exception to that general rule, however, when "the party urging mootness demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'"  Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d

346, 349 (D.C. Cir. 1997) (quoting <u>Davis</u>, 440 U.S. at 631); <u>see also</u> <u>Aref v. Lynch</u>, 833 F.3d

242, 251 (D.C. Cir. 2016).  Defendants have demonstrated that both prongs are satisfied here.

First, there is no reasonable expectation that the alleged violation will recur.  The claims

that Defendants contend are mooted by the NIE — counts 2–4 in Plaintiffs' Amended Complaint

— all identify the Proclamations as the source of the alleged harm.  <u>See</u> Def. MTD at 19; Am.

Compl., ¶¶ 276–93.  And it is undisputed that because the Secretary of State granted the NIE to

all K-visa applicants, Plaintiffs are no longer subject to the Proclamations.  <u>See</u> ECF No. 39 (Pl.

Opp.) at 10.  In the public announcement of the NIE, the State Department expressly explained

that "the Secretary of State determined that travel on an immigrant or fiancé(e) visa is in the

national interest for purposes of granting exceptions under the geographic COVID

proclamations."  Updates to NIE.  The Secretary went on to state that "[v]isa processing posts

may now grant immigrant and fiancé(e) visas to applicants otherwise eligible, notwithstanding

the[] proclamations."  <u>Id.</u>

Viewed together with subsequent developments, that announcement leaves no reasonable

expectation that Plaintiffs will again be subject to the Proclamations.  As a practical matter, it is

worth noting that consular offices have in fact adjudicated visa applications or scheduled visa

interviews for at least 565 of 583 Plaintiffs formerly affected by the Proclamations.  <u>See</u> Giblin

Decl., ¶ 7.  Since the initial NIE announcement, moreover, the Secretary has <u>expanded</u> the scope

of the NIE with regard to fiancé(e)-visa applicants.  For instance, when "the COVID-19

pandemic in the Republic of India [was] surging," President Biden issued a Proclamation

covering travelers from India.  <u>See</u> 86 Fed. Reg. at 24,297.  The Secretary swiftly responded by

expanding the NIE to include noncitizens seeking K visas who could be subject to the new

Proclamation.  <u>See</u> U.S. Dep't of State, <u>Presidential Proclamation on the Suspension of Entry as</u>

Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus

Disease 2019 (May 12, 2021), https://bit.ly/3gxX1gx.  In that announcement, the Secretary again

singled out fiancé(e)-visa applicants as covered by the NIE.  Id.  Nearly five months have passed

since the initial NIE, and, despite shifting pandemic conditions, almost all the Proclamation

Plaintiffs have now had their visas adjudicated.  The Secretary's actions, furthermore, suggest

that he is more likely to expand the sweep of the NIE going forward than to diminish it.

Plaintiffs' rejoinders are unavailing.  They first emphasize the fluid nature of pandemic

conditions and the Government's response, as well as point out that the announcement of the

initial NIE included an important caveat.  Specifically, that announcement stated, "As with all

national interest exceptions for qualified travelers seeking to enter the United States under a

Presidential Proclamation, if circumstances warrant, the Secretary of State may revise the

national interest determination."  Updates to NIE.  While Plaintiffs are correct that the Secretary

could, as a theoretical matter, change course with respect to the NIE, the record does not permit a

reasonable expectation that he will in fact do so.  For instance, Plaintiffs identify no example of

his scaling back the NIEs to disqualify other classes of non-citizens previously granted an

exception.  See Pl. Opp. at 9–11.

Plaintiffs' argument also disregards the background principle that the "government's

change of policy presents a special circumstance in the world of mootness."  Am. Cargo Transp.,

Inc. v. United States, 625 F.3d 1176, 1180 (9th Cir. 2010) (emphasis added).  "[U]nlike in the

case of a private party, [courts] presume the government is acting in good faith" when it changes

its policy.  Id.  Indeed, while the D.C. Circuit has not expressly addressed the issue, this Court

and a number of circuits have "consistently recognized that where the defendant is a government

actor — and not a private litigant — there is less concern about the recurrence of objectionable

behavior" after a change in policy.  Citizens for Resp. & Ethics in Washington v. Wheeler (CREW), 352 F. Supp. 3d 1, 13 (D.D.C. 2019) (internal quotation marks omitted); accord Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1117 (10th Cir. 2010); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 325 (5th Cir. 2009); Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004); Ammex, Inc. v. Cox, 351 F.3d 697, 705 (6th Cir. 2003); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) (citing 13A Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.7, at 353 (2d ed.1984)).  Here, there is not a shred of evidence to suggest that the Secretary granted the NIE in bad faith or intends to change course after this litigation ends.  See Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006) (crediting "unchallenged agency affidavit" that government "will not renew" challenged action and concluding that lawsuit was moot).

Turning to the second prong of the voluntary-cessation analysis, the Court concludes that granting the NIE to fiancé(e)-visa applicants eradicated the effects of the alleged violation caused by the Proclamations.  Plaintiffs' counterargument, generously construed, is that the Proclamations added to the allegedly unreasonable delay, and they are thus still suffering downstream effects of the Proclamations.  See Pl. Opp. at 11.  That argument improperly imports Plaintiffs' unreasonable-delay claim into their Proclamation claims.  The Amended Complaint nowhere asserts that the Proclamations caused unreasonable delay; rather, it contends that they unlawfully prevented U.S. Consulates and Embassies from issuing fiancé(e) visas at all.  See Am. Compl. ¶¶ 276–93.  Indeed, the Amended Complaint asks for an "[o]rder that applicants for K visas be categorically granted a national interest exception."  Id. at 137.  The Secretary of State subsequently granted that NIE, and consulates can and are issuing fiancé(e) visas in countries

previously affected by the Proclamations.  When, as here, "the harm alleged is a deficient policy

and the only relief sought is prospective, it is hard to see how any effect could possibly linger

after the [government] corrects the policy."  <u>CREW</u>, 352 F. Supp. 3d at 14.

       To the extent that Plaintiffs previously affected by the Proclamations are still

experiencing delays in visa adjudications, those delays are not due to the Proclamations.  "In the

cases in which the effects of an injury were not eradicated [by voluntary cessation], and thus kept

the controversy alive, 'some tangible, concrete effect, <u>traceable to the injury, and curable by the

relief demanded</u>, clearly remained.'"  <u>CREW</u>, 352 F. Supp. 3d at 14 (quoting <u>Penthouse Int'l,

Ltd. v. Meese</u>, 939 F.2d 1011, 1019 (D.C. Cir. 1991) (emphasis added).  Here, Plaintiffs cite an

alleged harm — <i>i.e.</i>, continued unreasonable delay in processing their visas — that is traceable

not to the Proclamations, but instead to the other allegedly unlawful acts taken by Defendants

that remain in effect.  Plaintiffs cannot rely on a continuing harm caused by a different policy to

prop up an otherwise moot claim against the Proclamations, which no longer affect them.

       2.   <i>Capable of Repetition Yet Evading Review</i>

       Undeterred, Plaintiffs contend that even if their Proclamation claims would be moot

under the ordinary rubric, the Court should nonetheless reach the merits because the claims are

capable of repetition yet evading review.  That mootness exception "applies where '(1) the

challenged action is in its duration too short to be fully litigated prior to cessation or expiration,

and (2) there is a reasonable expectation that the same complaining party will be subject to the

same action again.'"  <u>Fed. Election Comm'n v. Wisconsin Right To Life, Inc.</u>, 551 U.S. 449, 462

(2007) (quoting <u>Spencer v. Kemna</u>, 523 U.S. 1, 17 (1998)).  While "[t]he party seeking

jurisdictional dismissal must establish mootness, [] the opposing party has the burden to prove

that a mootness exception applies." <u>Reid v. Hurwitz</u>, 920 F.3d 828, 832 (D.C. Cir. 2019). Plaintiffs have not established that either predicate for applying the exception is present here.

First, they have not demonstrated that the challenged action is too short to be fully litigated prior to cessation or expiration. They contend that the "fluctuations of the COVID-19 pandemic and subsequent government responses create circumstances too brief for a case to be fully litigated." Pl. Opp. at 12. But the action at issue is not the "government response[]" to the pandemic or even the changes in visa processing writ large. Instead, the challenged action is the Secretary's implementation of the Proclamations. That action is not *per se* too short to be litigated. Unlike paradigmatic instances in which courts apply the exception because a claim could never be fully litigated during a prescribed, finite time period, <u>see</u> <u>Wisconsin Right To Life, Inc.</u>, 551 U.S. at 462–63, here the Government merely happened to change the challenged policy while this lawsuit was ongoing. If any such change in policy during litigation was always enough to satisfy the capable-of-repetition-yet-evading-review standard, then the exception would swallow the rule. Here, Plaintiffs provide no evidence to suggest that — as a categorical matter — the type of Secretarial action at issue always has a finite shelf life such that it cannot be fully litigated prior to cessation.

Even if it were that brief, Plaintiffs have also not carried their burden of showing a reasonable expectation that they will be subject to the same action again. That conclusion flows from the Court's determination that the first part of the voluntary-cessation doctrine is satisfied. Because "there is no reasonable expectation [] that the alleged violation will recur," <u>Davis</u>, 440 U.S. at 631 (internal quotation marks omitted), it inexorably follows that there cannot be "a reasonable expectation that the same complaining party will be subject to the same action again."

Spencer, 523 U.S. at 17 (alteration omitted).  Plaintiffs' claims regarding the Proclamations are

thus moot.

    B.  Unreasonable Delay

    The other main issue in this case has nothing to do with the Proclamations.  Plaintiffs

contend that the State Department has unreasonably delayed the adjudication and issuance of

their visas during the pandemic in countries both subject to the Proclamations and not.  That

delay, they maintain, violates the APA, which compels agencies to "conclude" matters presented

to them "within a reasonable time," 5 U.S.C. § 555(b), and directs courts to "compel agency

action . . . unreasonably delayed."  Id. § 706(1).  Defendants, for their part, do not dispute that

the issuance of fiancé(e) visas has been delayed during the pandemic.  Rather, they argue that the

delay is not unreasonable and that Plaintiffs' claims should be dismissed.  The Court concurs.

    To evaluate the reasonableness of agency delay, the Court examines six factors set out in

Telecommunications Research & Action Center v. FCC (TRAC), 750 F.2d 70 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a
> rule of reason;
> (2) where Congress has provided a timetable or other indication of
> the speed with which it expects the agency to proceed in the enabling
> statute, that statutory scheme may supply content for this rule of
> reason;
> (3) delays that might be reasonable in the sphere of economic
> regulation are less tolerable when human health and welfare are at
> stake;
> (4) the court should consider the effect of expediting delayed action
> on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of
> the interests prejudiced by delay; and
> (6) the court need not find any impropriety lurking behind agency
> lassitude in order to hold that agency action is unreasonably delayed.

Id. at 80 (internal quotations, citations, and emphasis omitted); see also Mashpee Wampanoag

Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  These six factors "are not

'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'"  In re Core Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting TRAC, 750 F.2d at 80).  "Each case must be analyzed according to its own unique circumstances," as each "will present its own slightly different set of factors to consider."  Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Board, 750 F.2d 81, 86 (D.C. Cir. 1984).

The Court already considered the TRAC factors in this case in the context of Plaintiffs' motion for a preliminary injunction.  There, it held, "A careful balancing of all six factors . . . leads the Court to conclude that the State Department's delay does not warrant judicial intervention at this juncture."  Milligan, 502 F. Supp. 3d at 320.  Here, the Court will lean on its prior analysis in explaining why the same result obtains.  Before delving into the factors, which the Court considers largely in order, it notes that despite Plaintiffs' protests to the contrary, it is appropriate to resolve this issue at the motion-to-dismiss stage because "this record contains enough facts to evaluate the TRAC factors now."  Sarlak v. Pompeo, No. 20-35, 2020 WL 3082018, at *5 (D.D.C. June 10, 2020) (collecting cases and evaluating TRAC factors on motion to dismiss); see also Dastagir v. Blinken, No. 20-2286, 2021 WL 2894645, at *2 (D.D.C. July 9, 2021); Zandieh v. Pompeo, No. 20-919, 2020 WL 4346915, at *5 (D.D.C. July 29, 2020).

The first two TRAC factors support Defendants, as they did when the Court initially considered the issue.  In its prior Opinion, the Court explained that while Congress expressed a "preference" that the State Department have "a policy of adjudicating K-1 visas 'within 30 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service,' [Congress] did not mandate a statutory deadline for K-1 visa adjudications."  Milligan, 502 F. Supp. 3d at 318 (quoting Consolidated Appropriations Act, 2000, Pub. L. 106-113, § 237(a), 113 Stat. 1051 (Nov. 29, 1999)).  "Absent a congressionally

supplied yardstick," the Court turned "to case law as a guide." Id. (quoting Sarlak, 2020 WL 3082018, at *6).  Citing precedent indicating that "[d]istrict courts have generally found that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable," id. (collecting cases), the Court concluded that Plaintiffs' delays of approximately eight months "provide[d] no basis for judicial intervention," id.

In addition to rehashing their assertion that Congress supplied a rule of reason, Plaintiffs contend that "Defendants' public facing announcements demonstrate the rule of reason by which they must operate."  Pl. Opp. at 22.  As to the former argument, Plaintiffs offer no basis to revisit the Court's prior conclusion.  As to the latter, their contention fails twice over.  First, they put forth no compelling reason why the "public facing announcements" of an agency should be understood to supply the granular substance of a rule of reason.  Second, even if the Court assumed the contrary, the public announcements that Plaintiffs point to do not form the basis of a rule that Defendants have failed to adhere to.  For instance, the general statement that "family reunification is a clear priority of the U.S. Government's immigration policy" hardly provides a carefully calibrated rule of reason.  Id.  Last, insofar as Plaintiffs argue that the additional time elapsed since the Court's last Opinion should change the outcome of the first two factors, that contention is unavailing because no Plaintiff has had a visa application pending for longer than 18 months.

The third and fifth TRAC factors, which look to the effects of agency delay, cut in the opposite direction.  When it initially addressed these factors, the Court explained that "Plaintiffs' 'health and welfare are at stake because the delay in adjudicating' the K-1 visas has forced [Plaintiffs] 'to endure a prolonged and indefinite separation' from their fiancé(e)s."  Milligan,

502 F. Supp. 3d at 319 (quoting <u>Didban</u>, 435 F. Supp. 3d at 177).  The Court "acknowledge[d] that the State Department's current delays are intended to safeguard the health and welfare of U.S. mission staff and the public, but conclude[d] that Plaintiffs face significant consequences without intervention" and that these factors therefore tipped in their favor.  <u>Id.</u> (internal quotation marks and citation omitted).

Defendants provide no reason for the Court to alter that conclusion.  They principally contend that advancing Plaintiffs' cases to the front of the line would benefit Plaintiffs at the expense of other visa applicants, and that the Court should defer to the State Department's health and welfare assessments.  <u>See</u> Def. MTD at 32–36.  While Defendants' first point has intuitive appeal, arguments about the effects of expediting delayed action on other priorities go to the heart of the fourth factor, not the third and fifth.  They cite no precedent, moreover, for the proposition that the Court should reflexively defer to State's health and welfare determination. <u>See</u> Def. MTD at 33–36.  Of course, Defendants are in the best position to assess the health risks that processing visa applications in person poses to embassy and consulate staff.  "This point is well-taken, but the nature of [P]laintiffs' interests and the prejudice to those interests from delay in processing their visas, still weigh in their favor."  <u>Tate v. Pompeo</u>, 513 F. Supp. 3d 132, 150 (D.D.C. 2021), <u>dismissed sub nom.</u> <u>Tate v. Blinken</u>, No. 21-5068, 2021 WL 3713559 (D.C. Cir. July 22, 2021).

The fourth factor — which examines "the effect of expediting delayed action on agency activities of a higher or competing priority," <u>TRAC</u>, 750 F.2d at 80 — weighs heavily in Defendants' favor.  In its preliminary-injunction Opinion, the Court recognized that "[t]his factor carries the greatest weight in many cases, and it does so here."  <u>Milligan</u>, 502 F. Supp. 3d at 319. That is because the delay Plaintiffs complained of stemmed from "resource-allocation decisions"

that "do not lend themselves to 'judicial reordering[s] [of] agency priorities.'" Id. (quoting

Bagherian, 442 F. Supp. 3d at 96 (internal quotation marks omitted and alterations in original)).

Indeed, the Court emphasized that "[t]his Circuit has 'refused to grant relief, even [though] all

the other factors considered in TRAC favored it, where a judicial order putting [the petitioner] at

the head of the queue [would] simply move[] all others back one space and produce[] no net

gain.'" Id. (quoting Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100 (internal

quotation marks omitted and alterations in original).  Because Plaintiffs were asking the Court to

"do just that," the fourth factor strongly tipped against them.  Id.

Plaintiffs' attempts to distinguish the Court's earlier ruling hold no water.  They urge the

Court to reconsider this factor on the ground that they are not asking to be moved to the "front of

the line" because no such "line" exists.  See Pl. Opp. at 27–32.  Contrary to that assertion,

however, the very premise of Plaintiffs' argument is that there is a backlog of visa applicants and

that they should be prioritized for processing ahead of others.  Courts have routinely held that

compelling an agency to reorder a line of applicants without any net gain "would impermissibly

interfere with the agency's 'unique' and 'authoritative [ ] position to view its projects as a whole,

estimate the prospects for each, and allocate its resources in the optimal way.'"  Didban, 435 F.

Supp. 3d at 176 (quoting In re Barr Labs., Inc., 930 F.2d 72, 76 (D.C. Cir. 1991)); see also Tate,

513 F. Supp. 3d at 150 ("While the effect of an individual case would be minimal, an

accumulation of such individual cases being pushed by judicial fiat to the front of the line would

erode the ability of agencies to determine their priorities.").  To the extent that Plaintiffs allege

that the lack of agency resources is an issue for the political branches to solve, see Pl. Opp. at 30,

they fail to account for the reality that the constraints on visa processing of all types arise from

extrinsic pressures caused by the pandemic, which Defendants have taken reasonable steps to address.

The sixth and final TRAC factor, which analyzes whether the delay is due to bad faith on the part of the agency, similarly falls in Defendants' column.  The Court previously concluded that this factor militated against granting relief because, while "Plaintiffs criticize Defendants' efforts and prioritization, [] they make no allegations of impropriety." Milligan, 502 F. Supp. 3d at 320.  In a last-ditch effort, Plaintiffs' Opposition asserts that they "do now allege bad faith on the part of the Defendants."  Pl. Opp. at 32.  The main problem with that late-breaking allegation, however, is that "[i]t is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss." Kingman Park Civic Ass'n v. Gray, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014).  Plaintiffs do not, and cannot, point to any allegation in their Amended Complaint that Defendants intentionally delayed the adjudication of Plaintiffs' visas. The reality, in any event, is that while the pandemic created an unfortunate but temporary backlog of fiancé(e)-visa applications, there is no evidence of bad faith on the part of Defendants; indeed, just 50 of the over 650 Plaintiffs are still awaiting adjudications. See Joint Status Report, Aug. 27, 2021, at 1; Bryan M. Giblin Decl., ¶ 4.

After balancing all six factors, the Court again concludes that the delay in processing Plaintiffs' visas is not unreasonable.  See Sarlak, 2020 WL 3082018, at *6 (collecting cases). While two factors favor Plaintiffs, the remaining ones all militate against them.  Mindful of the unfortunate situation that some Plaintiffs continue to endure, the Court "encourages the Government to act on the [remaining] application[s] as soon as possible," Didban, 435 F. Supp. 3d at 177, just as it has adjudicated most Plaintiffs' visa applications since the first Opinion in this case.

**IV.      Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss.  A

separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 2, 2021